# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF LOUISIANA

| | § | |
|---|---|---|
| IN RE: | § | CASE NO: 20-12108 |
| | § | |
| FRANK AND BARBARA VALLOT, | § | CHAPTER 11 |
| | § | |
| DEBTORS. | § | SECTION A |
| | § | |

## ORDER AND REASONS

On October 18, 2021, this Court held an evidentiary hearing (the "Hearing") to resolve the *Objection to IRS Proof of Claim* (the "Claim Objection"), [ECF Doc. 91], filed on June 29, 2021, by Debtors Frank and Barbara Vallot, and the Response to the Claim Objection filed on July 21, 2021, by the Internal Revenue Service, Department of the Treasury ("IRS"), [ECF Doc. 101]. At the close of the evidence, the Court took the matter under submission and now issues these findings of fact and conclusions of law. After considering the pleadings, the exhibits introduced into evidence, the testimony and demeanor of the witnesses, the record, applicable law, and the arguments of counsel, this Court OVERRULES the Debtors' Claim Objection and ALLOWS the amount claimed in Proof of Claim No. 28 filed by the IRS, subject to any statutory exemptions that may be available to and claimed by the Debtor.[1]

---

[1] As discussed below, the IRS tax lien has attached to all interests of the Debtors in property of the estate, including the Debtors' Home, an IRA, a Chevrolet, an ATV, an RTV, household items, electronics, musical instruments, jewelry, and certain securities. Some discussion was had at the Hearing regarding whether certain of those items are in fact property of the estate, and Frank Vallot testified as to his current and past use of musical instruments. Issues regarding any statutory exemptions that have been or will be claimed by the Debtors and any objections to those claimed exemptions are not before the Court at this time. This ruling focuses on the evidence presented by the parties regarding valuation of the Debtors' Home and IRA for purposes of determining the IRS's secured claim under § 506(a).

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(A), (B) & (O). The venue of the Debtors' chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

## FINDINGS OF FACT[2]

The Debtors are individuals who filed for bankruptcy relief on December 23, 2020, under a relatively new subchapter of chapter 11 of the Bankruptcy Code created by the Small Business Reorganization Act of 2019, Pub. L. No. 11654, 133 Stat. 1079 ("Subchapter V"). [ECF Doc. 1]. According to the status report submitted by the Debtors in preparation for the statutorily mandated status conference in Subchapter V cases, a company wholly owned by Frank Vallot, Acadian Cypress & Hardwoods, Inc. ("Acadian"), also filed for chapter 11 bankruptcy protection in this Court, and the Court recently confirmed the plan of reorganization in that case. [No. 19-12205, ECF Doc. 258]. Vallot continues to be employed by Acadian and he and his wife also own and manage numerous rental properties and investment real estate that are owned by various limited liability companies, each in which they are majority members. [ECF Doc. 51].

Twenty-eight proofs of claim have been filed against the Debtors' estate. Relevant here, the IRS filed Proof of Claim No. 28 asserting the following claims against the estate: (i) a secured claim for income taxes, interest, and additions to tax/penalties for the 2012 and 2014 tax years in the amount of $196,837.68; (ii) an unsecured priority claim for income taxes and interest for the

---

[2] These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

2019 tax year in the amount of $29,259.58; and (iii) and unsecured general claim for income taxes, interest, and additions to tax and penalties for the 2015 tax year and well as for additions to taxes and penalties on the IRS's unsecured priority claim, in the amount of $47,280.47. *See* Proof of Claim No. 28. The IRS asserts that the secured portion of its claim is secured by all of the Debtors' rights and interests in property pursuant to 26 U.S.C. § 6321. *See id.*

On March 23, 2021, the Debtors filed a plan of reorganization, [ECF Doc. 74], which drew objections by several creditors. [ECF Docs. 76, 77, 79]. The Debtors amended their plan on June 19, 2021, and again on July 22, 2021, which resolved many of the objections lodged by creditors. [ECF Docs. 98, 99, 106, 107 & 108]. On October 22, 2021, the Debtors filed a fourth plan of reorganization with immaterial modifications (the "Plan"). [ECF Doc. 156]. A hearing to consider confirmation of the Plan is currently scheduled for November 1, 2021, and the deadline to file objections as well as acceptances or rejections of the Plan is October 25, 2021. [ECF Doc. 112].

In pertinent part, the Debtors' Plan proposes to pay the IRS's priority claim of $29,259.58 plus 4.00% interest in equal installments over a period of 60 months. *See* Plan, § 4.02. The Plan anticipates no distributions to unsecured creditors, which would include the unsecured claim asserted by the IRS in Proof of Claim No. 28, as well as the deficiency portion of the IRS's secured claim, if any exists. *See* Plan, § 5.09. As to the IRS's secured claim, the Debtors' position (as stated at the Hearing as well as in the Plan) is that the value of the IRS's secured claim is no more than $32,817.09, secured by the Debtor's interests in the following assets:

    a. Property located at 3232 Napoleon Avenue, New Orleans, LA (the "Home")
    b. An Investment Retirement Account ("IRA")
    c. A Chevrolet
    d. An ATV
    e. An RTV

      f.  Household items

      g.  Electronics

      h.  Musical instruments

      i.  Jewelry

      j.  Certain securities

*See* Plan, § 5.07. The Debtors do not challenge the validity of the IRS's tax lien; the parties only dispute the amount of the IRS's secured claim, specifically the value of the Home and IRA.[3]

At the Hearing, the Court heard testimony from the following witnesses on behalf of the Debtors: (i) Frank Vallot; (ii) Thomas E. Pittman, P.E.; and (iii) Ricky M. Juban, Real Estate Appraiser & Consultant. The Court also heard testimony from Christopher Smiraldo, Senior Residential Appraiser, on behalf of the IRS. The parties stipulated to the qualifications of witnesses Pittman, Juban, and Smiraldo as experts in their fields and also to the admission of the following documents: Debtors' Schedules A/B, [ECF Doc. 2 & Joint Ex. 1]; the IRS Proof of Claim No. 28, [Joint Ex. 2]; and Proof of Claim No. 6 filed by Standard Mortgage Corp., [Joint Ex. 3]. The Court admitted the following exhibits into evidence:

      a.  IRS Ex. B (Smiroldo Residential Appraisal Report, dated June 29, 2021)
      b.  Debtors Ex. 1 (Juban Residential Appraisal Report dated June 28, 2021)
      c.  Debtors Ex. 2 (Juban Residential Appraisal Report dated Oct. 9, 2021)
      d.  Debtors Ex. 3 (Pittman Residential Damage Assessment, dated Oct. 4, 2021)
      e.  Debtors Ex. 4 (Pittman Repair Cost Estimate, dated Oct. 6, 2021)

---

[3] At the Hearing, the Debtors abandoned the argument asserted in their Claim Objection, namely that the value of the Home should be determined by calculating its "quick sale value" as provided in § 5.15.1.21 of the Internal Revenue Manual. *See* Hr'g Tr. at Min. 09:10–12:28.

### A. Testimony of Frank Vallot

Frank Vallot testified that he and his wife purchased the Home "as is" in 2010 for $200,000 and started living in the Home in 2011. *See* Hr'g Tr. at Min. 11:45–48. In 2020, Vallot said that he appealed the Orleans Parish Tax Assessor's valuation of the home at $437,000 and obtained a reduction of the assessment valuation to $351,000 and that he did not appeal that figure further. *See* Hr'g Tr. at Min 11:48–50. Vallot stated that the Tax Assessor's 2021 valuation of the Home is $296,000, and Vallot has initiated an appeal of that amount and is seeking to lower that assessment valuation. *See* Hr'g Tr. at Min. 11:49.

Vallot testified that he explored the option of selling the Home when he filed for bankruptcy relief in December 2020 and reported that he thought he would need to make repairs to the home in order to be able to list the Home at $300,000. *See* Hr'g Tr. at Min. 11:50–52. Vallot testified that Standard Mortgage Corp. holds a first-position mortgage on the Home and that the Vallots owe approximately $193,000. *See* Hr'g Tr. at Min. 11:55–57. He stated that the proposed Plan contemplates that the Vallots will enter into a loan modification agreement with Standard Mortgage Corp., which would place prepetition arrearages at the end of the loan term and reduce the current monthly principal and interest payments, as well as the interest rate on the Note. *See* Hr'g Tr. at Min. 11:55–58; *see also* Plan, § 5.03.

Vallot further testified that he had been making cosmetic repairs and upgrades to the Home himself over the years, but that he was not qualified or competent to complete any type of major renovations that require permitting. *See* Hr'g Tr. at Min. 11:46–56. He testified that the Home flooded in 2019, taking on sixteen inches of water on the ground floor. *See* Hr'g Tr. at Min. 11:46–49. And he stated that the he "tented" the Home in 2019 to combat termites. *See* Hr'g Tr. at Min.

12:09–12. On cross-examination, Vallot admitted that subsidence was a "major issue" for the Home when he purchased the Home "as-is" in 2010. *See* Hr'g Tr. at Min. 12:03–05.

Vallot also reported that he had refinanced the amount owed on the Home "one or more times," the most recent being 2016, for "maybe" more than $250,000, but he could not recall whether the lender required an inspection of the Home at that time. *See* Hr'g Tr. at Min. 12:04–09. He stated that he used the proceeds from the refinancing to pay college tuition and expenses for his children and to pay off other debts. *See* Hr'g Tr. at Min. 12:08–09.

**B. Testimony of Thomas Pittman, P.E.**

The Debtors retained a structural engineering consultant to provide testimony regarding the condition of the foundation of the Home. Thomas Pittman, P.E., testified regarding his forty years' experience inspecting, raising, and shoring commercial and residential foundations. *See* Hr'g Tr. at Min, 09:17–30. He and other witnesses testified that subsidence and foundation issues are common in that neighborhood of New Orleans. *See* Hr'g Tr. at Min. 09:45–46; 13:06–08. He reported that he examined the Home in September 2022 and estimated that the Home's foundation alone required an approximate $132,000 investment to correct the major issues related to subsidence. *See* Hr'g Tr. at Min. 09:24–28; Debtors Ex. 4. Pittman further testified that a total investment of $266,000 would be required to repair the foundation as well as the interior and exterior of the house to place the Home in a "pristine" condition. *See* Hr'g Tr. at Min. 09:48–50; Debtors Ex. 4.

**C. Testimony of Appraiser Ricky Juban**

The Debtors' appraiser, Ricky Juban, submitted two appraisals of the Home. The first report is dated June 12, 2021, and values the Home "as is" as of June 28, 2021, *see* Debtor Ex. 1, at 4; the second report is dated October 9, 2021, and values the Home "as is" as of July 27, 2021,

6

*see* Debtor Ex. 2, at 4.[4] Both of Juban's appraisal reports indicate that the appraisals are based on "an inspection of the property as well as information supplied by the client and/or owner if available." Debtors Ex. 1, at 1; Debtors Ex. 2, at 1. But Juban's testimony revealed that he had not inspected the Home for the first report; rather, he relied only upon information he obtained from Vallot. *See* Hr'g Tr. at Min. 10:37–39. Both appraisal reports indicate that the "intended use of the appraisal is to provide the client, Mr. Frank Vallot, with sufficient information regarding value or tax valuation purposes." *See* Debtors Ex. 1, at 4; Debtors Ex. 2, at 4. Vallot confirmed that he had used Juban's June 2021 appraisal in his recent appeal of the Orleans Parish Tax Assessor's assessment of the Home. *See* Hr'g Tr. at Min. 12:14–16.

Both appraisals are "restricted" appraisals, as defined under the Uniform Standards of Professional Appraisal Practice. The effect of a "restricted" appraisal here means that detailed information regarding various comparable sales selected by the appraiser are not included in the report; thus, the calculation for price per square foot appears to be calculated solely as a function of sales price per square footage of the comparable home. *See* Debtors Ex. 1, at 13; Debtors Ex. 2, at 13. Juban testified that the underlying data associated with those comparable sales are kept in a work file; however, that information was not offered as evidence in this proceeding. *See* Hr'g Tr. at Min. 10:52–11:16.

---

[4] The reports actually state that the date of the valuations are "June 1, 2012" and "July 27, 2012." Debtors Ex. 1, at 3; Debtors Ex. 2, at 3. The Court acknowledges that these are typographical errors, but observes that this is but one of several instances of carelessness in these reports that cause the Court to discount the helpfulness and legitimacy of the reports. For example the "Overall Effective Age" of the Home is listed as "Thirty (30) Years" and "Thirty Five (35) Years" on the respective reports. Debtors Ex. 1, at 3; Debtors Ex. 2, at 3. Yet Frank Vallot testified that the Home is over 100 years old, as is the case with most houses in that neighborhood of New Orleans. *See* Hr'g Tr. at Min. 11:38–12:28. And Juban's cross-examination revealed that the table calculating price per square foot of comparable properties contained significant mathematical errors. *See* Hr'g Tr. at Min. 11:06-17; Debtors Ex. 1, at 13.

In June 2021, Juban appraised the "as is" market value of the Home as of June 28, 2021, at $296,000, using a sales-comparison approach. *See* Debtors Ex. 1, at 14. Four months later, in October 2021, Juban retroactively appraised the "as is" market value of the Home as of July 27, 2021, at $202,000, also using a sales-comparison approach. *See* Debtors Ex. 1, at 14. Juban testified that the reason for his steep discount of the market value of the Home between June 28 and July 27 is attributable to the information that he received from Thomas Pittman, the Debtors' structural engineering consultant, who estimated that the Home required $262,000 to stabilize the foundation and repair all of the interior areas and the exterior of the Home. *See* Hr'g Tr. at Min. 10:54–59.

### D. Testimony of Appraiser Christopher Smiraldo

The IRS's appraiser, Christopher Smiraldo, SRA, provided testimony and one expert report appraising the "as is" market value of the Home as of June 29, 2021, to be $340,000, using a sales-comparison approach. *See* Hr'g Tr. at Min. 12:32–34; IRS Ex. B, at 3. The same report indicates that the "as is" market value of the Home as of December 30, 2020—the Debtors' petition date—was $378,000. *See* IRS Ex. B, at 3. The Smiraldo appraisal report is a "full" report under the Uniform Standards of Professional Appraisal Practice. *See* IRS Ex. B. Among other differences from a "restricted" appraisal, the reader of Smiraldo's "full" appraisal report can see detailed information regarding comparable sales and can discern the adjustments he has given to each comparable sale to account for differences in lot size, location, condition, room count, porches and basements, and off-street parking.

**CONCLUSIONS OF LAW**

A. **Standards for Resolving Claim Objections**

A properly filed proof of claim is deemed allowed unless a party in interest objects. *See* 11 U.S.C. § 502(a). "Upon objection by a party in interest, the claim is no longer 'deemed allowed' under section 502(a); however, if the proof of claim was correctly filed in accordance with the relevant rules, it still constitutes 'prima facie proof of that claim's validity and dollar value.'" *In re 804 Congress, L.L.C.*, 529 B.R. 213, 218 (Bankr. W.D. Tex. 2015) (quoting FED. R. BANKR. P. 3001(f)). Once the objecting party satisfies its burden to rebut the proof of claim's presumption of facial validity, the burden shifts back to the claim to prove its claim by a preponderance of the evidence. *See id.* at 219.

B. **Valuation of Secured Claims**

Section 506 of the Bankruptcy Code states that the value of a creditor's secured interest "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1); *see also Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 799 (5th Cir. 1997).

Focusing on the phrase "proposed disposition or use" of a creditor's collateral in § 506(a)(1), the United States Supreme Court in *Associates Commercial Corp. v. Rash* held that the appropriate standard courts should use to value collateral is the "replacement-value standard." 520 U.S. 953, 962 (1997). The Court defined "replacement value" as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 960. "Section 506(a) calls for the value the property possesses in light of the 'disposition or

9

use' in fact 'proposed,' not the various dispositions or uses that might have been proposed." *Id*. at 964. Further, in applying a replacement-value standard, the *Rash* Court left "to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented." *Id*. at 965 n.6. "Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property." *Id*.

Here, the Debtors wish to retain and use the Home over the objections of secured creditors who would have been able to exercise foreclosure rights outside of this bankruptcy proceeding. *See* Hr'g Tr. at Min. 13:08–12. "In sum, under § 506(a), the value of property retained because the debtor has exercised the [§ 1191(b) & (c)] 'cram down' option is the cost the debtor would incur to obtain a like asset for the same 'proposed . . . use.'" *Id*. at 965. Fifth Circuit precedent allows bankruptcy courts to determine the appropriate date of valuation in a chapter 11 cram-down context. *See Houston SportsNet Finance, L.L.C. v. Houston Astros, L.L.C. (In re Houston Reg'l Sports Network, L.P.)*, 886 F.3d 523, 528–31 (5th Cir. 2018).

### C. The Court Accepts the IRS's "As Is" Market Value Appraisal as of June 29, 2021 as the Replacement Value of the Debtors' Home

Both Juban and Smiraldo offered "as is" market value appraisals of the Home using the comparable-sales approach. Because the purpose of the valuation of the Home is to determine the treatment of the IRS's claim under the Debtors' proposed Plan, the appropriate valuation date here is a date near the confirmation date. For that reason, the Court disregards Smiraldo's valuation as of the Petition date. Further, the Court accepts Pittman's testimony and finds that the Home suffers from significant subsidence and foundation problems; therefore, the Court disregards Juban's

appraisal as of June 28, 2021, *see* Debtor's Ex. 1, as he testified that he did not consider the Home's foundation issues when he valued the Home at that time.

Although Juban's second appraisal purports to account for the Home's foundation issues, the appraisal report is opaque. Juban's comparable home sales include no information showing how the selected sales are similar to the Vallot Home and all of the comparable sales are older than two years—one reaches back to November 2017. Although Juban's report states that "adjustments have been considered for various factors which would influence value, such as the age of the properties, land area, physical appearance and condition, locational characteristics, size, and availability of market rates and terms of financing," none of those adjustments are visible in the report. *See* Debtors Ex. 2, at 12. Indeed, the price per square foot for each comparable sale appears to be calculated simply as a function of the sale price divided by the square footage of each property. *See id.* Although the prices per square foot for the comparable sales range from $80.27 to $97.35 (with the 2017 outlier generating a price per square foot of $64.10), Juban summarily bases his "as is" market value of the Home of $202,000 on a price per square foot of $60.00. *See* Debtors Ex. 2, at 13. The Court finds Juban's appraisal to be incomplete and thus unreliable.[5]

Smiraldo testified that he based his "as is" market value of the Home as of June 29, 2021, on his inspection of the Home and his analysis of comparable home sales. *See* Hr'g Tr. at Min. 12:32–44. He also testified that he accounted for subsidence issues and the poor condition of the Home's foundation in his overall rating of the Home's condition ("Fair"), and also by discounting

---

[5] Juban further muddies his analysis by imagining what the value of the Home would be if the repairs suggested by Pittman were completed to place the Home in pristine condition. *See* Debtors Ex. 2, at 13. But the task of the Court here is to determine the "cost the debtor would incur to obtain a like asset for the same 'proposed . . . use," *Rash*, 520 U.S. at 965; thus, "as is" market values based on contemporary sales of comparable homes are most helpful to resolve this matter.

the sales prices of certain comparable homes rated to be in "Superior" condition by 20%. *See* Hr'g Tr. at Min. 12:33–44; IRS Ex. B, at 4. The Court can easily discern from Smiraldo's report the adjustments he has given to each comparable sale to account for differences in lot size, location, condition, room count, porches and basements, and off-street parking as compared with the Vallot Home. Moreover, the comparable sales he used are within one year of the appraisal, making them a more accurate reflection of the market's reaction to the condition of the Home.

In line with the statutory language of § 506(a) and judicial precedent, this Court values the Property in accordance with the Debtor's proposed disposition or use of the Property, which is to retain and live in the Home. *See Rash*, 520 U.S. at 964; *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 799. Although both appraisers have similar experience and credentials, as discussed above, the Court declines to rely upon the Juban appraisal, as the Court has not been presented with sufficient information to ascertain whether Juban's selection of comparable homes and his methodology for calculating the market value of the Home is reliable. *See In re SCC Kyle Partners, Ltd.*, No. 12-11978, 2013 WL 2903453, at *13 (Bankr. W.D. Tex. June 14, 2013) ("[Since] the selection of comparable properties and the adjustments to their sales price bear significantly upon the ultimate value established for a subject property, the comparable properties selected and the means of adjusting their sales price must be closely scrutinized." (citation omitted)). The Court finds Smiraldo to be a measured, credible, and competent witness and affords considerable weight to his testimony. After weighing and considering the evidence, the Court concludes that the "as is" market value of the Home for purposes of confirmation and resolving the Claim Objection is $340,000.

### D. The Court Values the IRA at $29,114.00, Representing the Replacement Value of the IRS

As discussed above, when determining an allowed claim of a secured creditor pursuant to § 506(a) in light of the proposed distribution or use of collateral, the appropriate standard courts should use to value collateral is the "replacement-value standard." *Rash*, 520 U.S. at 962. The Debtors assert that this Court should value the IRA securing payment of the IRS's tax lien at its liquidation value, or the amount of funds that would remain upon the Debtors' liquidation of the account after payment of early-withdrawal penalties. *See* Claim Objection, ¶ 9; Hr'g Tr. at Min. 11:56–12:00. The IRS asserts that the IRA should be valued at its current value of $29,114.00 under *Rash*. *See* Response, ¶ 17.

The IRS is correct regarding the application of *Rash*; however, the evidence before the Court is unclear as to whether the Debtors' proposed disposition or use of the IRA is to retain the IRA or liquidate it.[6] Applying *Rash*, if the Debtors intend to retain the IRA, then the value of the IRA for purposes of determining the allowed secured claim of the IRS for confirmation of a Plan and resolving the Claim Objection is $29,114.00. If, however, the Debtors intend to liquidate the IRA, then the allowed secured claim of the IRS is the liquidated amount of the IRA after payment of early-withdrawal penalties. The Debtors are required to file a statement of intent regarding their treatment of the IRA into the record no later than Friday, October 29, 2021, at noon.

---

[6] The Debtors' Claim Objection and arguments of counsel at the Hearing imply that the Debtors desire to keep the IRA, but they value the IRA at its liquidation value for purposes of determining the IRS's secured claim. *See* Claim Objection, ¶ 9; Hr'g Tr. at Min. 11:56–12:00. The Debtors' proposed Plan, however, states that the value of the IRA is "[s]ubject to Judicial determination as to liquidation value," suggesting that perhaps they plan to liquidate the IRA. Plan, § 5.07, n.7.

## CONCLUSION

For the foregoing reasons, this Court OVERRULES the Debtors' Claim Objection and ALLOWS the IRS's Proof of Claim No. 28 in accordance with these findings of fact and conclusions of law.

**SO ORDERED.**

New Orleans, Louisiana, October 25, 2021.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE